**Affirmed and Memorandum Opinion filed November 16, 2017.**



In The

# Fourteenth Court of Appeals

### NO. 14-17-00421-CV

## IN THE INTEREST OF B.F., P.M.F. a/k/a P.F., CHILDREN

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2016-02643J**

## M E M O R A N D U M   O P I N I O N

The trial court terminated the parental rights of D.G.F. (Mother) with respect to her children, Ben and Pia,[1] and appointed the Texas Department of Family and Protective Services (the Department) to be the children's managing conservator. On appeal, Mother challenges the sufficiency of the evidence to support termination. We conclude legally and factually sufficient evidence supports the trial court's findings that Mother endangered her children and that termination of the parent-child relationship between Mother and her children is in each child's best interest. Therefore, we affirm the trial court's judgment.

---

[1] Ben and Pia are pseudonyms. *See* Tex. R. App. P. 9.8(b)(2).

BACKGROUND

## A.     Removal

The following facts come from the affidavit of Department investigative caseworker Roxanna De La Garza.

Pia and Mother both tested positive for cocaine in their urine when Pia was born. Pia showed no signs of withdrawal at birth, however. She weighed more than eight pounds and scored 9 and 10 on her Apgar tests. She had a broken arm due to a complication during delivery, but the injury was not drug-related.

De La Garza visited Mother at the hospital the next day. An interpreter facilitated their conversation because Mother did not speak English proficiently. Mother denied drinking alcohol or using drugs while she was pregnant. She said a man, whom she did not name, may have drugged her three weeks or so before she went into labor. De La Garza explained cocaine ingested that long ago would not be detectable in Mother's urine. Mother then mentioned another man, also unnamed, as the cause of her positive cocaine result. She said the man asked her to go out for beers three days before she gave birth to Pia. Mother was not interested in him, she told De La Garza, but eventually she acquiesced because she needed money and a ride. She refused to have sex with him, at which point he allegedly threatened her and forced her to use cocaine and drink alcohol. De La Garza noted in her affidavit that Mother "appeared to be searching for an answer" when probed about her positive test result.

The nurse caring for Mother and Pia reported Mother was loving, attentive, and appropriate with Pia. Mother was careful with Pia's broken arm and handled it as instructed. Other than the positive drug results, the nurse had no worries about Mother or Pia.

Ben was a year and a half old when Pia was born. He had lived with and been cared for by M.R., a friend of Mother's, since he was an infant. M.R. said she considered Ben to be her son and Mother to be his babysitter. Another friend of Mother's, M.C., told De La Garza she shared M.R.'s opinion.

M.R. wanted the Department to place Ben with her officially if he was removed from Mother's care. She said she would think about taking Pia as well. Mother could not identify a safe placement for Pia other than with M.R.

The Department removed both children and filed suit two days later, attaching De La Garza's affidavit to the original petition. The trial court signed an emergency order allowing the removal and naming the Department as the children's temporary managing conservator.

### B. Family service plan

Following a full adversary hearing, the trial court signed an order requiring Mother to comply with a Department family service plan. The service plan would identify the tasks and services she needed to complete before the children could be returned to her care.

The Department's service plan for Mother required her to, among other things: (1) complete parenting classes; (2) complete a substance abuse assessment and follow the assessor's recommendations; (3) attend Alcoholics Anonymous/Narcotics Anonymous (AA/NA) meetings, select a sponsor, and provide the caseworker with the sponsor's name; (4) submit to random drug testing and test negative at all times; (5) complete a psychosocial evaluation and follow the evaluator's recommendations; (6) obtain and maintain suitable employment and stable housing; (7) refrain from criminal activity; and (8) maintain regular contact with the caseworker.

## C. Trial

Trial was held a few days before Pia's first birthday. The Department presented testimony from Mother, caseworker Renee Hamilton, M.R., and Pia's foster father. The Department's documentary evidence included Mother's service plan and drug test results. All its evidence was admitted without objection. Neither Mother nor the children's attorney ad litem called witnesses or offered evidence.

### 1. Ben's birth and first twenty months

Mother testified she was raped in Honduras and became pregnant with Ben as a result. She lived in the Houston area for at least part of her pregnancy. Ben was born in August 2014. Mother did not have a stable place to live at that time, so she stayed with various friends.

M.R., who had helped Mother during her pregnancy, testified she began "watching" Ben when he was two months old because Mother needed to work. The record is not clear what M.R. meant by "watching." Either then or at another point during Ben's infancy, he went to live with M.R. and her family. Mother testified Ben was about six or seven months old at the time. She explained she would "take [Ben] and bring him back, and take him and bring him back and [M.R.] was taking care of him for me." M.R. loved Ben, Mother knew, and "basically raised" him.

M.R. testified she did not know Mother was using drugs.

### 2. Pia's birth

Pia was born in April 2016. Mother confirmed that, at the time Pia was born, she and Pia had cocaine in their systems, but the record does not contain the results of any drug test performed at that time on either Mother or Pia.

At trial, Mother admitted her statement to De La Garza about being drugged with cocaine at a concert was not true:

4

Q. .... And you explained that you believed you were drugged at a concert three weeks prior; is that right?

A. Yes.

Q. Okay. That's not true, though, is it?

A. No. A young man put something in my drink. He — three days before I gave birth to the child, I told him that I have some pain here in my hand. And he asked me to have some beers with him.

. . .

A. Well, it was three days before I gave birth. I had a lot of pain in my arm. They were cramping – my arms were cramping. I asked him to give me some money and because he was in love with me, he told me, Well, if you have some beers with me, then I'll give you the money.

And I said, Please don't be like that. I'm about to give birth, and I cannot drink anything.

And he said, Well, I won't give you any money if you don't drink the beers with me.

. . .

Q. So, while you were pregnant with [Pia], you drank the beers, correct?

A. Yes. Three days before giving birth.

Mother testified she believed the man put cocaine in her beer, and she passed the cocaine to Pia through her breast milk.

### 3. Progress for several months

*Services.* The Department accommodated Mother in completing her family service plan due to her language and literacy constraints. Caseworker Renee Hamilton said she communicated "a lot" with Mother, each time using an interpreter. She was confident she and Mother communicated effectively through the interpreter.

5

Hamilton read and explained the service plan to Mother, which led her to believe Mother fully understood her obligations despite her having only a second-grade education and not knowing how to read or write.

Hamilton testified about Mother's progress toward fulfilling the requirements of her service plan. Mother completed her parenting classes, but Hamilton noted Mother had not demonstrated the skills she should have learned in those classes. Mother finished her substance abuse counseling and was in the process of completing her individual counseling. She had a stable and acceptable living environment; she had been renting her own apartment for at least three months at the time of trial. Mother told Hamilton she cleaned houses for a living and earned $400 per week, which she was paid in cash, but Hamilton was unable to verify employment.

Mother attended AA/NA meetings, but she did not identify a sponsor as required by her plan until a few weeks before trial. She believed the program had nine steps, not twelve. When asked what step she was on, Mother replied, "Look, I got there, I was attending, I stopped, and then I began attending again. But I didn't have a sponsor, and I just know that they only sign every time I attend."

***Drug tests.*** Mother submitted to random drug tests, often twice a month. In mid-May 2016, two weeks after Pia was born, Mother was positive for cocaine in a hair sample at a level of 1,466 picograms per microgram (pg/mg). She tested negative for drugs through urinalysis and a substance abuse panel blood test, though. When tested at the beginning of June 2016, Mother's cocaine level in her hair had dropped to 1,070 pg/mg, and it was down to 529 pg/mg at the end of June. Her urine and blood tests were consistently negative for drugs. By mid-August 2016, Mother was negative for drugs in her urine, blood, and hair. She was tested several times over the next three months, and she remained negative.

### 4. Relapse and denial

Unfortunately, Mother relapsed in the second half of November or early December 2016. She tested positive by hair sample for 534 pg/mg of cocaine at her December 7 drug test. With the exception of one decrease in the beginning of February 2017, her cocaine level steadily increased through the end of March 2017, at which time her hair test showed a result of 1,330 pg/mg. She was also positive for alcohol at that time.

Mother's counsel tried to elicit testimony from Hamilton that the results of a hair follicle test depend on the part of the head from which the hair is taken. However, Hamilton did not know if that was true. Mother did not pursue that line of questioning further.

Hamilton testified Mother consistently denied using cocaine, even in the face of her positive test results. At trial, Mother at times tried to explain the results by saying she was drugged involuntarily and at times said she could not explain them. She remained steadfast in her denial throughout her testimony:

> Q. . . . Fair to say you have tested positive for cocaine on several occasions during this case as recently as February, 2017. Does that sound correct to you?
>
> A. They say I was positive to cocaine, but I cannot explain why because I'm very aware that I haven't done — been in drugs. I have no way to prove it but because the papers show that. But I'm very aware that I haven't done cocaine.
>
> . . .
>
> Q. Now, it's your testimony that you don't know how your [sic] testing positive for cocaine, right?
>
> A. Yes. And I'm very aware, very self-conscience [sic] that I haven't done drugs; and I'm going to fight for my children because —

Q. Can you please explain to the Court while the levels — why the levels of your cocaine tests are continuing to get higher if you are not using drugs?

A. That's what I cannot explain because I am aware that — I'm very very aware that I am not — I haven't been doing cocaine.

Hamilton felt termination of Mother's parental rights was in Ben's and Pia's best interest due to Mother's continued drug use and denial. She testified:

> [T]he mother has not completed her family service plan. She has not demonstrated an understanding that drugs are not acceptable for her to use. And she's continued to deny the use of drugs although we have positive drug tests. . . . [I]t's a concern if we were to place the children in the home. We have not alleviated the reason they came into custody.

Hamilton believed Mother's acknowledgment of her drug use was an important part of her recovery.

### 5. Ben and Pia

There is scant evidence in the record about Ben and Pia. Other than the cocaine in her system, Pia appeared healthy at birth. Neither child had any special physical or emotional needs. M.R. was meeting all of Ben's needs, and Pia's foster family was meeting all of hers. Both children were doing well in their placements. Pia was "very well bonded to the caregivers and [two] children in that home." Hamilton described Pia's interaction with her foster parents' two children:

> [Pia] follows them around the house. She mimics everything they do. She's — the few times I have seen them, because they are at school sometimes; but to me, she is blended into the house as if she's a biological child.

M.R. wanted to adopt Ben, and the foster parents wanted to adopt Pia. The Department approved of the proposed adoptions.

### 6. Trial court's findings

The trial court found Mother engaged in the conduct described in subsections D and E (both concerning endangerment of a child) and O (failure to comply with a court-ordered service plan) of section 161.001(b)(1) of the Family Code. The court additionally found termination of Mother's parental rights was in Ben's and Pia's best interest. The trial court appointed the Department to be the children's managing conservator. Mother timely appealed.

ANALYSIS

## I. Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. The child's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001 (West 2014 & Supp. 2016); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *accord J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *S.R.*, 452 S.W.3d at 358.

Parental rights can be terminated upon clear and convincing evidence that (1) the parent committed an act described in section 161.001(b)(1) of the Family

Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b). Only one predicate finding under section 161.001(b)(1) is necessary to support a decree of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence. *See J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II.    Predicate ground for termination: Endangerment (subsection E)

In her first three issues, Mother challenges the legal and factual sufficiency of

the evidence to support the trial court's findings under subsections D, E, and O of section 161.001(b)(1) of the Family Code. We conclude the evidence is legally and factually sufficient to support the trial court's subsection E finding. Accordingly, we do not review the findings under subsections D or O. *See A.V.*, 113 S.W.3d at 362.

## A.     Legal standards

Subsection E of Family Code section 161.001(b)(1) requires clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *S.R.*, 452 S.W.3d at 360. "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

A finding of endangerment under subsection E requires evidence the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *Id.* Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and

11

instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

The parent's conduct both before and after the Department removed the child from the home is relevant to a finding under subsection E. *See Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (considering persistence of endangering conduct up to time of trial); *In re A.R.M.*, No. 14-13-01039-CV, 2014 WL 1390285, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (considering criminal behavior and imprisonment through trial).

## B.    Substance abuse

A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *See J.O.A.*, 283 S.W.3d at 345; *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *S.R.*, 452 S.W.3d at 361–62. By using drugs, the parent exposes the child to the possibility that the parent may be impaired or imprisoned and, therefore, unable to take care of the child. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc).

A mother's use of drugs during pregnancy may be conduct which endangers the physical and emotional well-being of the child. *In re A.S.*, 261 S.W.3d 76, 86 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). However, termination is not automatic in such a case. *See A.S.*, 261 S.W.3d at 86 ("While unquestionably, an exercise of poor judgment, Veronica's use of marijuana on a single occasion, standing alone,

does not rise to the level of a conscious course of conduct."); *see also In re H.L.F.*, No. 12-11-00243-CV, 2012 WL 5993726, at \*5 (Tex. App.—Tyler Nov. 30, 2012, pet. denied) (mem. op.) (cited by Mother for proposition that mere fact of drug use during pregnancy does not mean termination is automatic).

## C. Application

### 1. Drug use preceding Pia's birth

Mother tested positive for cocaine when Pia was born. Initially, she denied taking cocaine. Then she said a man drugged her at a concert three weeks earlier. When told that scenario would not explain the cocaine still present at Pia's birth, she told the Department investigator a man forced her to use cocaine and drink beer. And at trial, she changed her story again, saying the man must have slipped the cocaine in her beer. As the sole judge of credibility, the trial court could have chosen to disbelieve Mother's ever-changing account. *See In re A.J.E.M.-B.*, Nos. 14-14-00424-CV, 14-14-00444-CV, 2014 WL 5795484, at \*14 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.) ("We acknowledge the Mother's testimony that she inadvertently used marijuana one time when she tested positive . . . . However, as the factfinder, the trial court was entitled to disbelieve the Mother's testimony and rely on the drug test results and other evidence.").

Pia was positive for cocaine as well. It appears she has not suffered further medical effects. But the drug's mere presence in her system harmed her, and the apparent lack of more damage does not diminish that harm. *See In re M.D.V.*, No. 14-04-00463-CV, 2005 WL 2787006, at \*3 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem. op.).

## 2. Drug use after removal

After testing negative for a number of months, Mother tested positive for cocaine about seven months after her children were removed. Her cocaine levels climbed fairly steadily over time. She had almost as much cocaine in her system one month before trial as she did when this case began. At trial, Mother flatly denied using cocaine, though she could not explain the positive results. The trial court was free to reject Mother's self-serving testimony in favor of scientific evidence. *See In re W.T.*, No. 14-17-00136-CV, 2017 WL 3567786, at *6 (Tex. App.—Houston [14th Dist.] Aug. 17, 2017, n.p.h.) (mem. op.) (affirming endangerment finding due to substance abuse despite mother's denial that she used drugs); *A.J.E.M.-B.*, 2014 WL 5795484, at *14.

Further, Hamilton testified she believed Mother was in denial about her addiction. A parent's unwillingness to admit she has a substance abuse problem suggests she will continue to abuse drugs and therefore continue to endanger her children. *See A.J.E.M.-B.*, 2014 WL 5795484, at *5 (considering evidence that parents "minimized concerns and were in denial of the impact that substance use has on their ability to sufficiently be in tune to the needs of their child."); *In re E.H.*, No. 02-09-00134-CV, 2010 WL 520774, at *4–*5 (Tex. App.—Fort Worth Feb. 11, 2010, no pet.) (mem. op.) (considering father's denial that his drug use and drug dealing harmed his children as factor in endangerment analysis).

## 3. Mother's arguments

Mother asserts on appeal:

> The results of hair follicle tests can vary if certain variables are uncontrolled such as which part of the head the hair is taken from and the length of the hair sample. The markers for cocaine are known to remain in the hair follicle ranging from three months up to six months.

There is no evidentiary support in the record for this assertion. To the contrary, at trial Mother tried to elicit testimony from Hamilton to support that assertion, but Hamilton said she did not know.

Instead, Mother attempts to shift the burden to the Department to explain her positive cocaine results. She writes, "[The Department] offered no expert testimony to interpret the test results and so the fact-finder was left to speculate as to what they actually imply." We have rejected that argument. *See L.G.R.*, 498 S.W.3d at 203 ("Mother does not cite, nor have we found, any legal authority supporting her argument that the Department was required to present expert testimony as to causation."); *In re C.M.-L.G.*, No. 14-16-00921-CV, 2017 WL 1719133, at *10 (Tex. App.—Houston [14th Dist.] May 2, 2017, pet. denied) ("Mother cites no authority, and we know of none, requiring expert testimony about drug test results in parental termination cases.").

### 4. Conclusion on endangerment

The evidence shows Mother had a substance abuse problem and was in denial about it, both of which endangered Ben and Pia. Considering all the evidence in the light most favorable to the endangerment finding, we conclude the trial court reasonably could have formed a firm belief or conviction that Mother engaged in conduct described in subsection E. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or conviction that Mother endangered her children. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding under subsection E. We overrule Mother's first three issues.

## III. Best interest

Mother's fourth issue challenges the legal and factual sufficiency of the

evidence to support the trial court's finding that termination of her parental rights is in Ben's and Pia's best interest.

## A. Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Prompt, permanent placement of the child in a safe environment is presumed to be in the child's best interest. *Id.* § 263.307(a) (West 2014 & Supp. 2016). The best interest of a child is strongly presumed to be served by keeping the child with the child's parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). *See also* Tex. Fam. Code Ann. § 263.307(b) (setting out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment).

### B. Application

#### 1. The children

When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *L.G.R.*, 498 S.W.3d at 205; *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.–Houston [14th Dist.] 2014, no pet.).

At the time of removal, 20-month-old Ben had lived with M.R. for most of his life. M.R. thought of herself as his mother and Mother as his babysitter. The Department formally placed Ben with M.R. after removal. She testified he was doing well, and she wanted to adopt him. The Department approved of that adoption.

Apart from having cocaine in her system, Pia was healthy at birth. She spent at most a few days with Mother. She was placed in a foster home, where she remained through the time of trial. Hamilton testified Pia was doing very well in that home and was well bonded to her foster parents and their two children. Her foster parents planned to adopt her, and the Department approved of that adoption as well.

#### 2. Mother

*Endangerment.* The evidence of Mother's endangerment of Ben and Pia, discussed above, is important to the best-interest analysis. *See S.R.*, 452 S.W.3d at 366.

*Stability.* At the time of trial, Mother had enjoyed a stable living environment for at least three months. She said she had a job cleaning houses for which she was paid $400 a week, but Hamilton was not able to verify her employment.

*Failure to complete service plan.* Mother did not complete certain tasks required by her service plan, nor did she achieve the plan's goals. She did not provide proof of her employment, had not finished her individual counseling, and tested

positive for drugs for the four months leading up to trial. Although she completed her parenting classes, the Department believed she had not "demonstrate[d] an acceptance of the responsibility of being a parent," one of the goals stated in her service plan. Mother also completed substance abuse counseling and attended AA/NA meetings, but her relapse shows she failed to meet another of her plan's goals: to "understand the serious nature of the situation that placed the child in harm's way."

### 3. Conclusion on best interest

Considering all the evidence in the light most favorable to the best-interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in each child's best interest. *See J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its best-interest finding is not so significant that the court could not reasonably have formed a firm belief or conviction that termination of Mother's rights was in Ben's and Pia's best interest. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding that termination is in the children's best interest. We overrule Mother's fourth issue.

## IV. Conservatorship

Mother does not raise an issue challenging the trial court's naming the Department as the children's managing conservator. Yet in two parts of her brief, the summary of the argument and the prayer for relief, she asserts the trial court should not have terminated her rights but rather left her rights intact while retaining the Department as the managing conservator. She writes:

[Mother's] parental-rights should not be terminated. [The children]

should remain in their current placements with continued sole managing conservatorship by [the Department]. [Mother] should be allowed to complete additional services or monitoring to satisfy [the Department] that she can remain drug-free, provide [the children] with a safe home environment, and be reunited with her children.

The brief contains neither a statement of the governing law supporting Mother's assertion nor any application of that law to the facts. *See* Tex. R. App. P. 38.1(i). As a result, Mother has waived any challenge to the trial court's conservatorship decision separate from her challenge to the trial court's termination decision. *See In re D.J.W.*, 394 S.W.3d 210, 223 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (holding mother in parental termination appeal waived challenge to best-interest finding because brief contained no legal argument in support of her challenge). We have already concluded the trial court's termination findings are supported by legally and factually sufficient evidence. We therefore overrule Mother's conservatorship challenge.

## CONCLUSION

We affirm the trial court's judgment.


/s/    J. Brett Busby
       Justice

Panel consists of Justices Jamison, Busby, and Donovan.